## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| JAMES DuCHARME, individually and as representatives of a class of similarly situated persons, and on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, | ) ) ) ) ) | CIVIL ACTION NO.: |
| Plaintiff, | ) ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| DST SYSTEMS, INC., THE ADVISORY COMMITTEE OF THE DST SYSTEMS, INC., 401(K) PROFIT SHARING PLAN, THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS OF DST SYSTEMS, INC., and John Does 1-20, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

## I. INTRODUCTION

1.    Plaintiff James Ducharme (hereinafter "Plaintiff"), by and through his attorneys, individually, as a representative of a class of participants and beneficiaries (collectively, "participants" or the "Class", as defined in paragraph 53, below) of the DST Systems, Inc. 401(k) Profit Sharing Plan (hereinafter "the DST Retirement Plan" or "Plan"), and on behalf of the Plan, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, brings this class action pursuant to §§ 409, 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), 29 U.S.C. §§ 1109, 1132(a)(2), and 1132(a)(3) against DST Systems, Inc., The Advisory Committee of the DST Systems, Inc., 401(k) Profit Sharing Plan, The Compensation Committee of the Board of

Directors of DST Systems, Inc., and John Does 1-20 (collectively, "Defendants"), each a fiduciary of the DST Retirement Plan, as defined under 29 U.S.C. § 1002(21)(A), for breaching the responsibilities, obligations, and/or duties imposed upon plan fiduciaries.

2.      DST provides global information processing services and support to clients in the asset management, insurance, retirement, brokerage and healthcare industries. Among its clients is the Sequoia Fund, Inc., for which, during the Class Period, it has served as registrar and shareholder servicing agent.

3.      The DST Retirement Plan is an individual account or defined contribution pension plan under 29 U.S.C. §§ 1002(2)(A) and 1002(34) and is subject to the provisions of ERISA. The Plan was established and is maintained under a written document in accordance with 29 U.S.C § 1102, and is intended to provide retirement savings and retirement income to employees of DST Systems, Inc. ("DST"), and certain of DST's subsidiaries and affiliate employers.

4.      On information and belief, the trustee of the Plan is BMO Harris Bank N.A. (the "Trustee"), which holds and administers all assets of the DST Retirement Plan.

5.      On information and belief, a portion of the Plan's assets are invested in the DST Systems, Inc. Master Trust ("Master Trust"). The investment manager of the Master Trust was and/or is Ruane, Cunniff, Goldfarb & Co., Inc. (the "Investment Manager" or "Ruane"). Ruane is also the distributor and advisor to the Sequoia Fund, Inc., which, in turn, is a client of DST.

6.      Plaintiff alleges that, during the Class Period defined in paragraph 54, below, Defendants breached their fiduciary duties by, *inter alia*, (1) failing to use the "care, skill, prudence, and diligence… that a prudent man acting in a like capacity and familiar with such matters would use;" (2) failing to diversify the investments of the DST Retirement Plan so as to

minimize the risk of large losses, when under the circumstances, and during the Class Period, it was clearly prudent to do so; (3) failing to confirm, during the Class Period, that the Plan's underlying investments were consistent with the stated description of the Plan; (4) failing to prudently select and monitor the Investment Manager and the Plan's investments during the Class Period; (5) failing to investigate the merits of the Plan's investments during the Class Period; (6) failing to select and/or retain an investment manager during the Class Period with whom they had no selfish interest apart from the interests of the Plan participants; (7) failing, during the Class Period, to discharge their duty to select and retain an investment manager solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to Plan participants and beneficiaries; (8) failing, during the Class Period, to disclose complete, accurate and material information regarding the assets in the DST Retirement Plan; (9) failing to determine the reasonableness of the compensation paid to Ruane during the Class Period; and (10) failing to investigate all decisions affecting the Plan during the Class Period.

7.      Plaintiff brings this action to recover, on behalf of the DST Retirement Plan, the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Class;

- Disgorgement and/or restitution of all payments and other compensation improperly received by Defendants, or, alternatively, the profits earned by Defendants in connection with their receipt of such unlawful payments and other unlawful compensation;

- All losses to the Plan resulting from Defendants' violation of ERISA;

- Compensatory damages;

3

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under the circumstances.

## II.    THE PARTIES

8.    Plaintiff is currently a resident of Johnson County, Kansas. Plaintiff was employed by DST Systems, Inc., from approximately October 11, 1993 until July 1, 2016, and is a participant, as defined by 29 U.S.C § 1002(7), in the DST Retirement Plan.

9.    Defendant DST is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Kansas City, Missouri. DST is the sponsor of the DST Retirement Plan and the administrator of the DST Retirement Plan. DST is a designated fiduciary of the DST Retirement Plan and a fiduciary under 29 U.S.C. §§ 1002, 1102.

10.    Defendant, the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Advisory Committee"), is named in the DST Retirement Plan as the "named fiduciary," a term that is defined in 29 U.S.C. §§ 1102, and is otherwise a fiduciary under 29 U.S.C. §§ 1002. The Advisory Committee maintains its address at the headquarters of DST Systems in Kansas City, Missouri.

11.    Defendant, the Compensation Committee of the Board of Directors of DST (the "Compensation Committee"), on information and belief, has the sole authority to select and remove members of the Advisory Committee. As such, the Compensation Committee, and each of its members, is a Plan fiduciary under 29 U.S.C. § 1002 since the committee, and its members, among other things, appoint other Plan fiduciaries. The Compensation Committee maintains its address at the headquarters of DST Systems in Kansas City, Missouri.

12.    Plaintiff is currently unaware of the members of the Compensation Committee

and Advisory Committee, each of whom is a Plan fiduciary under 29 U.S.C. §§ 1002, 1102. Plaintiff refers to them, collectively, as John Does 1-20.

## II.       JURISDICTION AND VENUE

13.     This Court has federal question subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. § 1132(a)(2), for which district courts of the United States have exclusive jurisdiction. 29 U.S.C. § 1132(e)(1). This Court also has diversity jurisdiction over this matter under 28 U.S.C. § 1332(a) since the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. Finally, this Court has jurisdiction over this matter 28 U.S.C. § 1332(d) since the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which a member of the Class is a citizen of a State different from a defendant.

14.     Venue is proper in this district because DST administers the Plan in this district, the breaches complained of took place in this district, DST, which has its headquarters in Kansas City, Missouri, resides in this district, the Advisory Committee, which maintains its address at the headquarters of DST Systems, resides in this district, and the Compensation Committee, which maintains its address at the headquarters of DST Systems, resides in this district. 29 U.S.C. § 1132(e)(2). All Defendants are subject to nationwide service of process under 29 U.S.C. § 1132(e)(2).

## III.      GENERAL ALLEGATIONS

15.     Under the terms of the DST Retirement Plan, the Plan consist of two components: *first*, a 401(k) portion, which includes participant payroll and DST's matching contributions, and *second*, a "profit sharing" portion, which includes only contributions made by DST or certain of its affiliate employers who have adopted the DST Retirement Plan for the benefit of their

5

employees.

16.     As for the assets in the 401(k) portion of their individual accounts (hereinafter "the 401(k) portion" of the Plan), participants may exercise some control by choosing from a variety of mutual fund investment options made available by the Advisory Committee or, until recently (December 31, 2014), DST stock. However, although Plan participants could control, to some degree, the assets in the 401(k) portion of their individual accounts, they could not meaningfully minimize, through diversification, the overall risk of their portfolio nor could they construct a portfolio generative of a continuous and normally appropriate range of risks and returns.

17.     This is because, as for the assets in the profit-sharing portion of their individual accounts (hereinafter the "profit-sharing portion" of the Plan), participants could *not* exercise any control. Instead, the Trustee, as advised by the Investment Manager, which, in turn, was advised during the Class Period by Defendants, controlled the assets in the profit-sharing portion of the Plan.

18.     In fact, during the Class Period, the Summary Plan Description (the "SPD")[1] advised participants in the DST Retirement Plan that assets in the profit-sharing portion of the Plan which, on information and belief, consists of more than half of the Plan's assets, "will be invested by the Trustee as advised by Ruane, Cunniff & Goldfarb, Inc.," and that "[participants] may not direct the investment of these funds into other investment alternatives." In its Form 11-K, for the fiscal year ending December 31, 2013, the Plan stated that "[t]he investment in Master Trust is non-participant directed and is managed by the Investment Manager."

19.     Thus, as for the assets in the profit-sharing portion of the Plan, participants relied

---

[1] *See* Exhibit A.

6

entirely upon Plan fiduciaries to invest the assets with the care, skill, prudence, and diligence of a prudent investor, to ensure that those assets were adequately diversified to minimize the risk of large losses, and to fully and accurately disclose the nature of the investments in the profit-sharing portion of the Plan.

20.    DST recently disclosed, however, that in contravention of the fiduciary obligations owed by those with discretion and control over the profit-sharing portion of the Plan, including each of the Defendants, the profit-sharing portion of the Plan was *not* properly diversified, even though during the Class Period it remained prudent to diversify the profit-sharing assets. In fact, rather than minimize the risk of large losses to the Plan, Plan assets were invested heavily and imprudently, beginning in 2010 and without adequate disclosure to Plan participants, in the stock of Valeant Pharmaceuticals International, Inc. ("Valeant"), such that, as the value of Valeant stock dropped from a high of approximately $258 per share on or about July 31, 2015, to $15.41 per share on or about January 10, 2016, the Plan, and all participants, suffered enormous losses. The failure to diversify during the Class Period was the result of a defective and inappropriate process abusive of the lawful discretion afforded Defendants.

21.    On information and belief, at the end of 2014, approximately 30% of the profit-sharing portion of the DST Retirement Plan consisted of Valeant stock. This amounted to approximately 15% of the Plant's combined assets and constituted a clear breach of Defendants' duty to diversify Plan assets in an appropriate and prudent manner.

22.    On information and belief, during the Class Period and as a result of Defendants' breaches, as aforesaid, the value of the Plan's position in Valeant fell from a high of approximately $415 million to approximately $22 million, a loss of nearly $395 million.

23.    Securities and Exchange Commission ("SEC") guidelines illustrate the extremity

and imprudence of the Plan's concentration in Valeant. Under SEC guidelines, which Defendants knew or should have known, a mutual fund cannot invest more than 25 percent (25%) of its assets in a single industry without disclosing the strategy to investors in the fund's prospectus. *See* Investment Company Act Release No. 13436 (Aug. 12, 1983) ("1983 Form N-lA Adopting Release"). *See also* Investment Company Act Release No. 23064 (Mar. 13, 1998) (Mar. 23, 1998) ("Form N-lA Adopting Release"). The SEC recognizes the immense risk inherent in concentrating assets in a single industry, including even those that contain hundreds of companies with a collective market capitalization in the trillions. In this case, Defendants invested 30 percent (30%) of the assets in the profit-sharing portion of the Plan *in a single stock.* No prudent fiduciary under like circumstances would have or could have made the same decision to invest so heavily in a single stock.

24.     Moreover, contrary to the assertion in the SPD that "[t]he Plan … reflect[s] your Employer's concern for your long-term *savings* need," Valeant, as shown below, pursued a particularly risky and aggressive growth strategy. Thus, even if prudence allowed for concentration in a single stock, which it does not, no prudent fiduciary under like circumstances would have or could have made the decision to invest so heavily in Valeant.

25.     Valeant is a Canadian healthcare company that develops, manufactures, and markets branded generic pharmaceuticals, over-the-counter products, and other medical products. On information and belief, Valeant has pursued an aggressive growth-by-acquisition model since at least 2008. In 2008, for example, Valeant bought Coria Laboratories for $95 million and DermaTech (an Australian company) for $12.6 million.[2] The following year, in 2009, Valeant bought Dow Pharmaceutical Sciences Inc., for $285 million and in 2010, Valeant

---

[2] *Timeline - Shakeup at Valeant as Longtime CEO Pearson Leaving*, Reuters (March 21, 2016), http://www.reuters.com/article/valeant-timeline-idUSL2N16T1SQ.

8

bought Aton Pharmaceuticals for $318 million.[3] In 2011, Valeant bought PharmaSwiss for $481 million and AB Sanitas of Lithuania for about $500 million.[4] Then, in 2012, Valeant bought Medicis Pharmaceutical Corp. for $2.6 billion and in 2013, Valeant bought Bausch & Lomb for $8.6 billion. Finally, in 2015, Valeant bought Salix Pharmaceuticals for $11 billion.[5]

26.     Indeed, Valeant publicly disclosed that a "critical element" of its strategy was "business development" through acquisitions.[6]

27.     Valeant also engaged in creative accounting, using "cash earnings per share" as its earnings measure. This method shows far greater income than under standard generally accepted accounting principles ("GAAP") that investors typically use to compare companies. Under GAAP, the company posted $70 million in net income for the first nine months of 2015. Under its own cash earnings measure, however, the company posted a "profit" of $2.7 billion.[7]

28.     Thus, Valeant pursued a particularly risky and potentially dubious growth strategy, during the entire Class Period, that clearly did not meet the Plan's purported investing criteria or the criteria of an objectively prudent fiduciary.

29.     Prudent fiduciaries, moreover, would have known that Valeant was a volatile and risky stock during the Class Period. Valeant made public its aggressive strategy and was the subject of intense industry scrutiny and speculation about whether its aggressive growth strategy, accounting, and business were legitimate. Investors and analysts publicly expressed significant concerns during the Class Period. The following is an example:

    a.  In March 2014, Jim Grant, a financial journalist, asserted that Valeant was a

---

[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] See Valeant Pharm. Int'l, Inc., *2014 Annual Report* at i (2015), http://ir.valeant.com/~/media/Files/V/Valeant-IR/reports-and-presentations/893698-final-ar-2015-v001-x21nf3.pdf.
[7] *See, e.g.,* M. Rapoport & L. Hoffman, *Valeant: An Accounting Pioneer, Too*, Wall Street J., (Dec. 15, 2015), http://www.wsj.com/articles/valeant-an-accounting-pioneer-too-1450202504.

"financialized pharmaceutical company," a claim that rung true since Valeant

invested just 2.7 percent of sales into research and development, compared to

an average of 13.8 percent among its competitors;[8]

b. In May 2014, Bronte Capital's John Hempton announced that his fund was

shorting Valeant, calling its accounting "difficult to comprehend."[9]

c. In May 2014, hedge fund billionaire Jim Chanos observed that Valeant was

playing "aggressive accounting games." He also criticized Valeant's

acquisition strategy, noting the dangers and potential accounting issues

associated with relying on purchasing other companies for long-term

growth.[10]

d. In June 2014, an email from a Morgan Stanley investment banker was

released calling Valeant a "house of cards."[11]

e. On October 21, 2015, Citron Research released a report titled: "Valeant:

Could this be the Pharmaceutical Enron?" Citron questioned Valeant's

relationship with the pharmacy Philidor and asked whether Valeant was

"Enron part Deux??"[12]

f. On or about October 31, 2015, Charlie Munger, Berkshire Hathaway's vice

chairman and a close business partner of Warren Buffett, publicly called

Valeant's practices "deeply immoral" and its business strategy

---

[8] *See Contrarian Legend Jim Grant Presents His Killer Case Against Valeant Pharmaceuticals*, Bus. In Can. (Mar. 6, 2014), https://businessincanada.com /2014/03/06/jim-grant-bearish-case-on-valeant-pharmaceuticals/.
[9] *See Timeline*, *supra* note ___.
[10] *See* Linette Lopez, *Wall Street is starting to believe what Jim Chanos has been saying about Valean all along*, Bus. Insider (Nov. 4, 2015), http://www.business insider.com/is-valeant-an-accounting-roll-up-2015-11.
[11] *See* Soyoung Kim & Olivia Oran, *Morgan Stanley calls Valeant 'house of cards' in Allergan pitch*, Reuters (June 16, 2014), http://www.reuters.com/article/us-allergan-morganstanley-idUSKBN0ER1L120140616.
[12] *See* Citron Research, *Valeant and Philidor RX The Big Coverup* (2015), http://www.citronresearch.com/wp-content/uploads/2015/10/Valeant-Philador-and-RandO-final-a.pdf.

unsustainable.[13]

30. There was even public discord among the directors of the Sequoia Fund Inc., for which Ruane was the distributor and advisor, about Valeant. On October 25, 2015, two of the four independent directors resigned in protest after Ruane announced that the fund had purchased an additional 1.5 million shares of Valeant.[14] Thus, Defendants knew or should have known by at least 2011 that Valeant was a particularly risky and imprudent investment.

31. A plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have, prior to or upon the Plan's concentration in a single stock, ordered that the profit-sharing portion of the Plan be diversified so as to minimize the risk of large losses. A prudent fiduciary would have been particularly vigilant in reviewing and investigating the decision to invest in, and to continue investing in, Valeant given the widespread and extensive public concern with the company. Indeed, a plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have known of Valeant's volatile and risky growth strategy by at least early 2014, and would have by then ordered that the Plan divest itself of the risky stock.

32. Defendants, however, did not act with the care, skill, prudence, and diligence of a prudent person. Despite public concern with Valeant and the obvious lack of diversification in the profit-sharing portion of the Plan during the Class Period, and its attendant risk of large losses to the Plan during the Class Period, Defendants (1) failed to diversify the profit-sharing portion of the Plan so as to minimize the risk of large losses, when under the circumstances it was clearly prudent to do so; (2) failed to confirm that the Plan's underlying investments were

---

[13] James B. Stewart, *Huge Valeant Stake Exposes Rift at Sequoia Fund*, N.Y. Times, Nov. 12, 2015, http://www.nytimes.com/2015/11/13/business/huge-valeant-stake-exposes-rift-at-sequoia-fund.html?_r=0.
[14]

consistent with the stated description of the Plan; (3) failed to prudently select and monitor Ruane and the Plan's highly-concentrated investments; and (4) failed to investigate the prudence of the Plan's Valeant investment.

33.     In addition, while a plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have elected not to retain and/or continue to retain Ruane as an investment manager, in light of its demonstrable imprudence in failing to adequately diversify the profit-sharing portion of the Plan and in buying the stock of a volatile, risky and unsustainable business, Defendants, acting with objective imprudence, continued to retain Ruane even as the Valeant stock plummeted and the Plan experienced enormous losses.

34.     Moreover, Ruane is the distributor and advisor to the Sequoia Fund, Inc., which, in turn, is a client of DST (DST serves as the registrar and shareholder servicing agent for the Sequoia Fund, Inc.). Thus, DST receives, and has received during the Class Period, compensation from a fund for which Ruane is the advisor. A plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have avoided this obvious conflict of interest.

35.     Defendants, however, did not act with the care, skill, prudence, and diligence of a prudent person. Defendants selected and retained an investment manager, during the Class Period, with whom they had a selfish interest, apart from the interests of the Plan participants. By retaining Ruane during the Class Period, Defendants failed to discharge their duty to select and retain an investment manager solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to Plan participants and beneficiaries.

36.     In fact, with the authority, approval and consent of the Defendants, which authority, approval and consent Defendants provided while acting as Plan fiduciaries, Ruane

charged the DST Retirement Plan an annual fee of one percent (1%) of the assets in the Master Trust. The fee is grossly and objectively excessive and exceeds that which, if acting without self-interest, with the requisite prudence and oversight, and in the sole interest of the Plan and its participant, Defendants could have negotiated. A prudent fiduciary under like circumstances would have negotiated an annual fee of far less than one percent (1%). Thus, by failing to determine and/or investigate the reasonableness of the compensation paid to Ruane, Defendants breached the fiduciary duties owed to the Plan.

37.     Finally, while acting as Plan fiduciaries during the Class Period, Defendants failed to provide participants with sufficient information regarding the nature of the profit-sharing portion of the Plan such that participants could make informed decision with regard to the management of the 401(k) portion of their individual accounts. A plan fiduciary acting with the care, skill, prudence, and diligence of a prudent person would have informed Plan participants of the concentration of the profit-sharing portion of the Plan in Valeant stock and of the volatile, risky and unsustainable business of Valeant. Defendants, however, did not act with the care, skill, prudence, and diligence of a prudent person. Defendants failed to disclose complete, accurate and material information regarding the nature of the assets in the DST Retirement Plan.

38.     As shown herein, Defendants clearly failed to investigate all decisions affecting the Plan during the Class Period. As a result, Defendants breached the fiduciary duties owed to the Plan.

## IV. ERISA'S FIDUCIARY STANDARDS

39.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of

    (i)  providing benefits to participants and their beneficiaries; and
    (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; [and]

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

40.    The most fundamental duty of ERISA plan fiduciaries is a duty of complete loyalty, under 29 U.S.C. § 1104(a)(1), which requires that plan fiduciaries discharge their duties "solely in the interest of the participants and the beneficiaries," i.e., "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Among the responsibilities and duties imposed on fiduciaries by ERISA is avoidance of conflicts of interest. *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 251–52, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

41.    Second, the fiduciary must meet a "prudent man" standard under 29 U.S.C. § 1104(a)(1)(B), to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use" and "with single-minded devotion" to the plan participants and beneficiaries.

42.    According to the Department of Labor, 29 C.F.R. § 2550.404a–1(b), these requirements are satisfied if the fiduciary

    (i)      Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment

14

course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and

(ii)     Has acted accordingly.

"Appropriate consideration" for purposes of this regulation includes, but is not limited to,

(i)     A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and

(ii)     Consideration of the following factors as they relate to such *portion* of the portfolio:

(A)     The composition of the portfolio with regard to diversification;

(B)     The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(C)     The projected return of the portfolio relative to the funding objectives of the plan.

*Id.* at § 2550.404a–1(b)(2).

43.     Third, the ERISA fiduciary must diversify the plan's investments to minimize risk of loss unless, under the circumstances, it is clearly prudent not to diversify. 29 U.S.C. § 1104(a)(1)(C).

44.     ERISA and its associated regulations also impose upon fiduciaries extensive and specific obligations of disclosure. *See generally* 29 U.S.C. §§ 1021 et seq. *See also Shea v. Esensten*, 107 F.3d 625, 629 (8th Cir. 1997), *cert. denied,* 522 U.S. 914, 118 S.Ct. 297, 139 L.Ed.2d 229 (1997)("an ERISA fiduciary has a duty to speak out if it "knows that silence might be harmful.")

45.     For example, ERISA requires that a fiduciary disclose latent conflicts of interest

15

which may affect a participants' ability to make informed decisions about their benefits. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 600 (8th Cir. 2009).

46.     Moreover, when an ERISA plan, like the DST Retirement Plan, offers participants the opportunity to invest their own retirement funds, fiduciaries have an ongoing duty to monitor the plan's investment options and performance to ensure that they are prudent. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015). Accordingly, "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 1829.

47.     ERISA's fiduciary duties have been described by the Eight Circuit, and others, as "the highest known to the law." *See Braden*, 588 F.3d at 598 (quotation omitted).

48.     A fiduciary, meanwhile, is defined as any person "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C.A. § 1002(21)(A)(i).

49.     For example, a person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his or her position has discretionary authority or control over the management or administration of the plan and is a fiduciary to the extent that he or she or it exercises, or refuses to exercise, that power. *Hickman v. Tosco Corp.,* 840 F.2d 564, 566 (8th Cir.1988)("Tosco is a fiduciary within the meaning of ERISA ... because it appoints and removes the members of the administrative committee that administers the pension plan.")

16

50.     In addition to those fiduciaries described in Section 3(21)(A)(i), 29 U.S.C.A. §

1002(21)(A)(i), ERISA also requires that every plan shall provide for one or more "named

fiduciaries" who "jointly or severally shall have authority to control and manage the operation

and administration of the plan." 29 U.S.C.A. § 1102.

51.     In this case, each Defendant was, during the Class Period, a fiduciary of the Plan

under 29 U.S.C.A. § 1102 and/or § 1002(21)(A)(i). Each Defendant managed, advised, and/or

administered the Plan, and/or appointed and/or monitored a Plan fiduciary.

52.     Thus, Defendants, and each of them, owed each of the duties described above.

## V.     CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action, under Rule 23 of the Federal Rules of Civil Procedure,

individually, on behalf of the Plan, and on behalf of the following class of person similarly

situated:

> All persons who were participants in or beneficiaries of the DST
> Retirement Plan at any time during the period from December 31, 2011
> through the date of judgment. The following persons are excluded from
> the Class: Defendants; members of their immediate families; and their
> heirs, successors or assigns.

54.     The Class Period is the period from December 31, 2011 through the date of

judgment.

55.     Rule 23(a)(1) is satisfied since the Class is so large that joinder of all its members

is impractical. Indeed, the Class is composed of at least several thousands of members.

56.     Rule 23(a)(2) is satisfied since there are questions of law and/or fact, apt to drive

the resolution of the litigation, common to the class, which include, without limitation: (1)

whether Defendants were fiduciaries of the Plan during the Class Period; (2) whether Defendants

breached their fiduciary duties by selecting and retaining Ruane during the Class Period; (3)

whether Defendants breached their fiduciary duties by failing to ensure that the profit-sharing portion of the plan was sufficiently diverse during the Class Period so as to minimize the risk of large losses, when under the circumstances it was clearly prudent to do so; (4) whether Defendants breached their fiduciary duties by failing to confirm that the Plan's underlying investments were consistent with the stated description of the Plan; (5) whether Defendants breached their fiduciary duties by failing to prudently monitor Ruane so as to ensure prudent investments and reasonable compensation; (6) whether Defendants breached their fiduciary duties by failing to investigate the merits of the Plan's investments so as to protect against unreasonable and imprudent risks; (7) whether Defendants breached their fiduciary duties by selecting and retaining an investment manager from which DST profited through a pre-existing and self-interested relationship; (8) whether Defendants breached their fiduciary duties by failing to disclose complete, accurate and material information regarding the Valeant assets in the profit-sharing portion of the Plan; and (9) whether the Plan was damaged by these alleged breaches of fiduciary duty.

57.     Rule 23(a)(3) is satisfied since Plaintiff's claims are typical of the claims of the Class since (1) Plaintiff was a Plan participant during the Class Period; (2) Plaintiff seeks recovery for injuries to the Plan, rather than to himself, individually; (3) Plaintiff's claims and those of the Class stem from a single set events and are based upon the same remedial theory; and (4) the injury alleged was not caused by any Class Member's exercise of control over the 401(k) portion of their account.

58.     Rule 23(a)(4) is satisfied since Plaintiff will fairly and adequately protect the interests of the Class since, as described above, Plaintiff seeks recovery for injuries to the Plan, rather than to himself, individually, and, therefore has no interest that is in conflict with the

interest of the Class. Moreover, Plaintiff has selected qualified counsel that meet the criteria in Rule 23(g).

59.     Additionally, since Plaintiff's claims involve allegations that Defendants breached their fiduciary duties to the Plan, the prosecution of separate action by individual Class members would likely establish incompatible standards of conduct. Moreover, since Plaintiff brings his claims on behalf of the Plan and seeks recovery to the Plan, resolution of this case would, as a practical matter, be dispositive of the interests of the other participants. Indeed, separate action by individual plaintiffs would impair the ability of participants to protect their interests if suits were allowed to proceed without use of the class action device. Thus, Plaintiff claims meet the requirements for class certification under Rules 23(b)(1)(A) and 23(b)(1)(B).

60.     Plaintiff's claims also meet the requirements for class certification under Rule 23(b)(2) since the Defendants have acted and/or refused to act on grounds that apply generally to the class, so that final injunctive relief and corresponding declaratory relief is only appropriate with respect to the class as a whole.

61.     Finally, a class action is superior to the other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the class is impracticable and Plaintiff's claims are typical of the Class. Furthermore, as the injury suffered by some of the individual members of the class may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to enforce their rights through individual suits. In addition, the questions of law and/or fact common to the Class predominate over any questions affecting only individual members of the Class. Indeed, Plaintiffs knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Thus, Plaintiff claims meet

the requirements for class certification under Rules 23(b)(3).

## COUNT I
### (For Breach of Fiduciary Duty)

62.     To the extent they are consistent with the allegations in this Count, Plaintiff incorporates all other allegations of this Petition as though more fully set forth herein.

63.     Defendants are fiduciaries of the Plan under ERISA, as explained above, and are fiduciaries based on the discretion, authority and/or control with respect to the administration, management and/or disposition of the Plan and its assets, and/or provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plan and Defendants' authority and responsibility with respect to the administration and management of the Plan and its assets.

64.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and (C) in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan, with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims.

65.     As set forth above, Defendants breached (1) the duty of complete loyalty; (2) the duty to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use;" (3) the duty to diversify the plan's investments to minimize risk of loss unless; (4) the duty to appoint, monitor and remove appointees; (5) the duty to provide necessary and material information to

20

Plan participants; and (6) the duty to follow the terms of the Plan.

66.     In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

67.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29, U.S.C. § 1132, Defendants, and each of them, are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty. Therefore, Plaintiff, on behalf of himself and the Plan, requests all equitable, compensatory and/or remedial relief, including prospective injunctive and declaratory relief, as well as credit, disgorgement and restitution, and attorneys' fees, costs and other recoverable expenses of litigation, and requests that the Court enjoin Defendants from further breaches of their fiduciary duties.

## COUNT II
### (For Breach of Co-Fiduciary Duty)

68.     To the extent they are consistent with the allegations in this Count, Plaintiff incorporates all other allegations of this Petition as though more fully set forth herein.

69.     Defendants are each a co-fiduciary of the Plan under section 405(a) of ERISA, 29 U.S.C. § 1105(a).

70.     As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by, among other things, the duty of prudence.

71.     ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all

three provisions.

72.     ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

73.     ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Defendants knowingly participated in the breaches of the other Defendants because, as alleged above, each of the Defendants participated in the management of the Plan's improper investment in and failure to monitor the Fund and, upon information and belief, knowingly participated in the improper management of and failure to monitor that investment by the other Defendants.

74.     ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

75.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other participants and beneficiaries, lost millions of dollars of retirement savings.

76.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of

fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III
### (In The Alternative, Liability for Knowing Breach of Trust)

77.     To the extent they are consistent with the allegations in this Count, Plaintiff incorporates all other allegations of this Petition as though more fully set forth herein.

78.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

79.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed (and possess) the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in the breaches of fiduciary duty as aforesaid.

WHEREFORE, Plaintiff, on behalf of himself and the Class, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Class may be justly

entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

Respectfully submitted,

THE KLAMANN LAW FIRM

BY: /s/ *Andrew Schermerhorn*
John M. Klamann       MO 29335
Andrew Schermerhorn   MO 62101
Paul D. Anderson       MO 65354
4435 Main Street, Suite 150
Kansas City, MO 64111
Telephone: (816) 421-2626
Facsimile: (816) 421-8686
jklamann@klamannlaw.com
ajs@klamannlaw.com
panderson@klamannlaw.com

KAPKE & WILLERTH
Ted Kapke       MO 52114
Mike Fleming     MO 53970
3304 N.E. Ralph Powell Road
Lee's Summit, MO 64064
Telephone: (816) 461-3800
Facsimile: (816) 254-8014
ted@kapkewillerth.com
mike@kapkewillerth.com

WHITE, GRAHAM, BUCKLEY & CARR
William Carr      MO 40091
Bryan T. White    MO 58805
19049 East Valley View Parkway
Independence, Missouri 64055
(816) 373-9080 Fax: (816) 373-9319
bwhite@wagblaw.com

HUMPHREY, FARRINGTON & McCLAIN
Kenneth B. McClain   MO 32430
221 West Lexington, Suite 400,
P.O. Box 900
Independence, Missouri 64051
Telephone: (816) 836-5050

24

Facsimile:  (816) 836-8966
kbm@hfmlegal.com